UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                Criminal No. 06-333 (JMR/FLN)

    Plaintiff,

v.                                                       **REPORT AND RECOMMENDATION**

Hugo Sanchez Perez,

    Defendant.

_____

Joseph Dixon, Assistant United States Attorney, for the Government.
Kevin M. O'Brien, Esq., for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on November 8, 2006, on Defendant's Motion for suppression of statements [#19], Defendant's Motion for suppression of evidence from search and seizure [#20], and the Government's Motion to Supplement the Record [#29]. At the hearing, the Court received testimony from Minneapolis Police Officer Jose F. Gomez. The Government submitted two search warrants for two side-by-side residences of a duplex as Government's exhibit number 1 and 2. The Government submitted a transcription and translation of the interview with Defendant as Government's exhibit number 3. These matters were referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends that the Government's Motion to Supplement the Record be granted and that Defendant's Motions be denied.

**I.   FINDINGS OF FACT**

    **A.**    **The Search Warrants for the Two Residences of the Duplex**

The facts used to support the issuance of the search warrant submitted as exhibit number 1 are virtually identical to the facts used to support the issuance of the search warrant submitted by

the Government as exhibit number 2, and are related as follows. The search warrants in exhibit number one and two were issued to search side-by side residences of a duplex on Chicago Avenue South. Minneapolis Police Officer Jose F. Gomez (hereinafter "Officer Gomez") was the affiant for both search warrants. Officer Gomez is a twelve year veteran of the Minneapolis Police Department who is currently assigned to the Minneapolis Narcotics Unit and investigates mid-level narcotics traffickers and large scale narcotics organizations. Officer Gomez has received training in narcotics investigation from the Minneapolis Police Department.

Officer Gomez received information from a confidential reliable informant (hereinafter "CRI") that a Hispanic male known as "Pedro" was a large scale cocaine distributor in Minneapolis and that "Pedro" lived in a side-by-side duplex on Chicago Avenue South. The CRI informed Officer Gomez that "Pedro" resided at both units of the duplex and conducted his narcotics transactions from both units. The CRI described "Pedro" as possessing a medium build, short black hair, a goatee, approximately five foot six inches in height, and informed Officer Gomez that "Pedro" is a Sureno 13 gang member. The CRI provided Officer Gomez with a telephone number for "Pedro".

Officer Gomez testified in his affidavit in support of these search warrants that, 72 hours prior to applying for the search warrants, the CRI made a controlled purchase of cocaine from "Pedro". The CRI contacted "Pedro" at the telephone number he provided to Officer Gomez and "Pedro" instructed the CRI to go to "Pedro's" house and wait for "Pedro", who would arrive in approximately twenty minutes. Officer Gomez searched the CRI prior to conducting the controlled purchase, with negative results, and then provided the CRI with pre-recorded buy money to complete the purchase. Stationary surveillance was conducted of the duplex on Chicago Avenue

South, and the CRI arrived at the duplex to wait for "Pedro". While the CRI waited in the front yard of the duplex for "Pedro" to arrive, the surveillance team observed a Hispanic male wearing a black sleeveless shirt exit the front of one unit of the duplex and enter the front of the other. A few minutes later the surveillance team observed a Hispanic female carrying a child do the same. Approximately ten minutes later, the surveillance team observed a Hispanic male wearing a blue sleeveless shirt exit the same unit of the duplex that the woman and man had previously entered, and the CRI was permitted into the residence by this person.

The CRI told Officer Gomez that the man in the blue sleeveless shirt was "Pedro" and that the man in the black sleeveless shirt was "Pedro's" brother. The CRI informed Officer Gomez that, once the CRI was inside the residence, "Pedro" handed the CRI a quantity of cocaine and the CRI provided "Pedro" with the pre-recorded buy money. "Pedro" accepted the money and placed it in his pocket. The CRI then exited the front of the unit and met with Officer Gomez, who retrieved the cocaine. The cocaine field tested positive. The CRI informed Officer Gomez that "Pedro's" family owns the duplex and that "Pedro" lives between both units of the duplex.

After conducting the controlled buy Officer Gomez contacted Officer Francisco Porras (hereinafter "Officer Porras") of the Minnesota Gang Strike Force and asked him if he was familiar with the duplex address or the individuals. Officer Porras stated that he had been to the address in the past and knew that Sureno 13 gang members frequented both units of the duplex. Officer Porras noted that, when he visited this address, he identified Defendant with an address of one unit of the duplex. Officer Gomez then printed out a Department of Motor Vehicle photograph of Defendant and showed it to the CRI, who positively identified Defendant as "Pedro". Defendant's drivers license lists one unit of the duplex as his address. Officer Gomez further investigated Defendant

through the State database "GangNet" and determined that Defendant is a documented gang member of the Sureno 13 Gang.

Officer Gomez then conducted a Property Information Search through the Hennepin County Tax web database, which revealed that Defendant was the owner and tax payer for both units of the duplex on Chicago Avenue South. Based on the above information, Officer Gomez requested a search warrant for both units of the duplex, and Defendant's person, to search for and seize narcotics, drug paraphernalia, monies, firearms, ammunition, radio and telecommunications devices used to facilitate narcotics sales, as well as weighing and packaging materials, mailings to show constructive possession of controlled substances, and other property obtained from the illegal sale of narcotics. Both affidavits state that they were "subscribed and sworn to . . . on this day of __08__, 20_06_." (*See* Ex. 1 and 2.) In addition, both affidavits request that the search be a nighttime search and that officers be permitted to make an unannounced entry. The search warrants were signed by a Hennepin County District Court judge on September 8, 2006.

### B.   Testimony of Minneapolis Police Officer Jose F. Gomez

Officer Gomez testified at the hearing on these matters. Officer Gomez testified that he applied for the two search warrants described above on September 8, 2006. Officer Gomez testified that he must have made a transcription error on the applications for the search warrants, but that he applied for the two warrants on September 8, 2006. Officer Gomez testified that, when the warrants were issued, he believed that the warrants were valid. Officer Gomez testified that the warrants were executed on September 14, 2006, and that he was present during their execution.

Officer Gomez testified that the Minneapolis SWAT unit performed the initial entry into both units of the duplex at the same time. Officer Gomez assisted in securing the perimeter while the

SWAT team performed the initial entry. Once both residences were secure, Officer Gomez and other officers entered both duplex units. Officer Gomez testified that there were three adults and three children in the unit that he entered, and one of the adults was Defendant. Officer Gomez testified that there were approximately five SWAT officers and six perimeter officers, including himself, in the duplex where Defendant was located. When Officer Gomez entered the residence Defendant was lying on the floor in the living room and he was handcuffed, along with the other adult residents. Defendant was searched pursuant to the search warrants, which permitted the officers to search Defendant's person. Officer Gomez testified that he speaks fluent Spanish and that Defendant also speaks Spanish. Officer Gomez testified that he did not advise Defendant that he was under arrest at the time that he entered the residence.

Officer Gomez testified that he or another officer helped Defendant to stand up and Officer Gomez took Defendant into the bathroom. Officer Gomez testified that he closed the bathroom door. Officer Gomez testified that he communicated with Defendant in Spanish and informed Defendant that the police had warrants for both units of the duplex. Officer Gomez testified that he then said something to the effect that if Defendant wanted to cooperate or help himself out, was there anything they should know that would help himself out. Officer Gomez testified that Defendant responded that he had a gun and a small amount of cocaine. Defendant told Officer Gomez that the gun "was in that room". Officer Gomez testified that Defendant did not verbally identify which room the gun was located in, but that Defendant was referring to his bedroom.

Officer Gomez testified that the encounter in the bathroom with Defendant lasted two to three minutes. Officer Gomez testified that there were other officers searching Defendant's bedroom while he conversed with Defendant in the bathroom. While they were conversing in the bathroom,

the SWAT officers left the premises, so there were only six officers in the unit when Officer Gomez and Defendant emerged from the bathroom. Officer Gomez testified that these officers were searching systematically through the house through containers in which the evidence authorized to be seized by the warrant could be found. Officer Gomez testified that he brought Defendant out of the bathroom and placed him back into the living room, but that he did not tell the other officers what Defendant had said. Officer Gomez testified that after he placed Defendant in the living room he stopped by the kitchen table to look at the inventory being conducted. By the time he walked back to the bedroom another officer had already retrieved the firearm from the bedroom, along with cocaine that was also found in a dresser drawer of Defendant's bedroom. Officer Gomez testified that the bedroom where the firearm and cocaine were found was right next to the bathroom and there was only one bathroom in the duplex unit. Officer Gomez testified that the firearm was found along with some ammunition in the closet in the bedroom on the top shelf in a closed tin popcorn container. Officer Gomez testified that, after the above events he informed Defendant, in Spanish, that he was under arrest.

    **C.**    **Defendant's Statement to Officer Gomez, Officer Gomez's Recitation of Defendant's Miranda Rights, and the Government's Motion to Supplement the Record.**

Officer Gomez testified that Defendant was brought to the station to the Minneapolis Narcotics Officer interview room where he was interviewed by Officer Gomez. Defendant was handcuffed to a chair during the interview. Officer Gomez testified that he read Defendant his rights in Spanish off a *Miranda* card that has an English to Spanish translation. Officer Gomez testified that he stopped after he recited each right and asked Defendant if he understood those rights. Defendant responded in the affirmative each time, and Defendant agreed to speak with Officer

Gomez. Defendant did not sign a written waiver of his *Miranda* rights. Officer Gomez testified that the interview lasted eight to ten minutes and that he was the one to terminate the interview.

In a memorandum submitted after the hearings on these matters, Defendant argues that there was no valid waiver of his *Miranda* rights in the present case. Defendant argues that, translated into English, Officer Gomez said the following to Defendant "Like you (sic) to talk with me about the case or like you (sic) talk with a lawyer?" (Def.'s Mem. at 6.) Defendant argues that, assuming that he understood the question, he was given a false choice: to either talk with Officer Gomez or with a lawyer. Defendant argues that, "[r]ather than waiving his right to have an attorney present for questioning, what he did was acknowledge a preference to speak with Officer Gomez." (Def.'s Mem. at 6.) Defendant argues that a valid waiver would have included a preference to speak with Officer Gomez alone, without an attorney present. Defendant further argues that, since Officer Gomez used deficient Spanish language to communicate Defendant's rights, the waiver is invalid. Defendant argues that the exchange between himself and Officer Gomez does not establish that Defendant made a knowing, voluntary and intelligent waiver of his *Miranda* rights.

Upon receiving notice of Defendant's claims concerning the *Miranda* warning he was given prior to making a formal statement to Officer Gomez, the Government made a motion to supplement the record with Government's exhibit number 3, a transcription and translation of the interview prepared by a federally certified interpreter. The Court has reviewed this motion and concludes that the Government should be permitted to supplement the record with exhibit number 3. Therefore, the Court recommends that the Government's motion to supplement the record [#29] should be granted.

Exhibit number three reveals that Officer Gomez and Defendant had the following exchange:

7

> *Officer Gomez*: . . . you are here for narcotics and because of the, the weapon we found. Uh, before we talk, talk about the case, I will do, I will read you the rights you have. Do you know how to read in Spanish?
> *Defendant*: Yes
> *Officer Gomez*: Yes? OK, Mmm . . . Here, I will read you each right and then you say yes or no out loud, OK? You have the absolute right to remain silent. Do you understand?
> *Defendant*: Yes
> *Officer Gomez*: Everything you say can and will be used against you in Court. Do you understand?
> *Defendant*: Yes.
> *Officer Gomez*: You have the right to speak to an attorney and to have him present before and while we interrogate you. Do you understand?
> *Defendant*: Yes
> *Officer Gomez*: If you don't have money to pay an attorney, you will be assigned one for free to represent you if you wish so. Do you understand?
> *Defendant*: Yes
> *Officer Gomez*: You can de, decide at any time to exercise these rights and to not answer any question and to not make any statement. Do you understand?
> *Defendant*: Yes
> *Officer Gomez*: OK. You did understand all the rights, didn't you?
> *Defendant*: Yes.
> *Officer Gomez*: OK. Uh, would you like to talk to me about the, the case, or would you like to talk to an attorney?
> *Defendant*: Yes, I can talk to you, about, about the case.

(Ex. 3 at 1-2.)

## II. CONCLUSIONS OF LAW

### A. The Search Warrants Were Supported by Probable Cause

Defendant challenges the search warrants in this case on their four corners, alleging that the warrants were issued without probable cause. Defendant argues that neither of the two applications bears a legible date. (Def.'s Mem. at 6.) Defendant argues that the four corners of the search warrant applications do not establish probable cause for their issuance because there was an insufficient showing of when the events alleged in support of the applications ever actually occurred. Defendant argues that the applications state that Officer Gomez received information from the CRI

concerning Defendant's alleged drug distribution, but no time frame for the receipt of this information is related. In addition, Defendant notes that the applications state that the CRI made a controlled purchase within "the last 72 hours" but since the date is not legible on the applications the time period within which the purchase was made is unknown. Defendant argues that "[m]erely assuming a date as to when the controlled buy occurred or when the application was presented, without facts in the four corners of the document, is speculation" and that the totality of the circumstances does not support a finding of probable cause. (Def.'s Mem. at 7.) Defendant further argues that the search warrant was so lacking in probable cause that Officer Gomez's reliance on it was unreasonable.

Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir.2002). The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir.2004).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court " 'had a substantial basis for . . . conclud[ing] that probable cause existed.' " *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir.2003) (quoting *Gates*, 462 U.S. at 238-39.) Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir.1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

As noted by the Eighth Circuit, "[w]hen an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations-but not independent, essential elements-in finding probable cause." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir.1986) (citing *Gates*, at 230; *United States v. Ross*, 713 F.2d 389, 393 (8th Cir.1983)). As explained by the United States Supreme Court in *Gates*, the reliability and basis of knowledge of an informant

> are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

462 U.S. at 233. The Eighth Circuit relied on *Gates* in *United States v. Anderson* when the court noted that "an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination." 933 F.2d 612, 615 (8th Cir.1991) (citing *Gates*, 462 U.S. at 230).

In the present case, looking at the totality of the circumstances, a reasonable person could believe there was a fair probability that contraband or evidence of narcotics trafficking would be found in both units of the duplex, based on the information contained in the affidavits in support of the search warrants. The CRI conducted a controlled purchase of cocaine from "Pedro", which

Officer Gomez arranged. The CRI provided the cocaine procured from the controlled buy to Officer Gomez. The cocaine was field tested positive. Officer Gomez then contacted Officer Porras to determine whether Officer Porras had any information about the residence or the address. Officer Porras confirmed that members of the Sureno 13 gang frequented that location. Officer Porras identified Defendant as a person he had encountered before at that address. Officer Gomez printed out the drivers license photograph of Defendant and the CRI positively identified Defendant as "Pedro". Officer Gomez then corroborated the CRI's statement that "Pedro" was a member of Sureno 13 by conducting further investigation about Defendant on the State database "GangNet". Finally, Officer Gomez checked the property records and confirmed that Defendant was the listed owner and tax payer for both units. This information corroborated the CRI's statement that "Pedro's" family owned both units of the duplex and that "Pedro" lived between both addresses.

Looking at all the information in the search warrant affidavits under the totality of the circumstances, a reasonable person could believe that there was a fair probability that evidence of narcotics trafficking would be found in both units of the duplex. Defendant was the listed owner and tax payer for both properties and his brother had been observed moving from one unit to the other. Defendant had been observed conducting a controlled purchase with the CRI from one unit of the duplex and the cocaine received as a result of that purchase field tested positive.

Although the search warrant application did not specifically state the date it was compiled, the Court rejects Defendant's argument that the four corners of the warrant applications do not establish probable cause because there is an insufficient showing of when the events alleged in support of the application really occurred. A review of the applications in this case reveals that the omission of the month was a transcription error. The search warrants were signed by a Hennepin

County District Court judge on September 8, 2006. The applications state that they were "Subscribed and sworn to before me this day of __08__, 20_06_". It is clear from a review of the record that the omission of the month was a transcription error, and that these applications were subscribed and sworn to by Officer Gomez on September 8, 2006; therefore, this date is the appropriate date to use to determine when the other events in the applications occurred. Looking at the totality of the circumstances, the Court concludes that probable cause existed to issue both of the warrants in the present case. Accordingly, the Court recommends that Defendant's motion for suppression of evidence from search and seizure [#19] be denied insofar as it seeks to challenge the issuance of the search warrants for lack of probable cause.

> B. **Assuming Without Deciding that the Unwarned Statement Defendant Made to Officer Gomez was Involuntary, the Motion to Suppress the Firearm and Ammunition Seized During the Search of the Residence Should be Denied.**

Defendant argues that the statement he made in the bathroom to Officer Gomez was involuntary and, therefore, the statement should be suppressed. Defendant further argues that the firearm and ammunition discovered in the duplex should be suppressed because derivative physical evidence seized as a result of an involuntary statement is not admissible pursuant to *United States v. Villalba Alvarado*, 345 F.3d 1007, 1018 (8th Cir.2003).

Assuming without deciding that the statement Defendant made to Officer Gomez in the bathroom of the duplex was involuntary, the Court concludes that there is nothing to suppress as a result of this involuntary statement. The Government has represented that it will not "adduce evidence at trial of the statement given during the search." (Gov.'s Mem. in Opp. at 4, n.3.) Therefore, this statement does not need to be suppressed, as it will not be utilized in the Government's case in chief.

In addition, the testimony of Officer Gomez established that the firearm and ammunition were found by other officers in the bedroom before Officer Gomez informed the officers searching Defendant's bedroom of Defendant's statement. Officer Gomez testified that he talked to Defendant in the bathroom for two to three minutes, and then returned Defendant to the living room, which was the opposite direction as the bedroom where the firearm was located. Officer Gomez testified that, once he placed Defendant in the living room, he went to the kitchen to check on the inventory of the property being seized, and then made his way back to the bedroom. By the time Officer Gomez reached the back bedroom, he testified that the other officers searching the bedroom had already uncovered the firearm and the ammunition in the tin popcorn can on the shelf in the closet. There was no testimony or other evidence presented, during the hearing or otherwise, to contradict Officer Gomez's testimony. As the firearm and ammunition were discovered by officers who were unaware of Defendant's statement, the discovery of the firearm and ammunition could not possibly be the fruit of Defendant's involuntary statement. As officers were empowered by the search warrant to search for and seize any firearms or ammunition that were located at the search address, the officers were lawfully empowered to search for and retain possession of the firearm and the ammunition before Officer Gomez disclosed the substance of Defendant's statements. As the officers who discovered the firearm were unaware of the statement, their discovery of the firearm cannot be considered a fruit of the involuntary statement, and the Court recommends that Defendant's motion to suppress the firearm be denied.

In its response to Defendant's memorandum, the Government noted that "the issue of voluntariness was not squarely presented at the hearing" and noted that "to the extent the Court believes the evidence was somehow deficient, the government asks to present additional testimony."

(Mem. in Opp. at 5, n.4.)  However, by assuming without deciding that the statement was involuntary, the Court does not need to determine whether the record is incomplete concerning the question of voluntariness.  Since the Court rests its decision in this case on the premise that the statement was involuntary, no further testimony is necessary.

        **C.**     **The Government Has Met Its Burden to Prove that Defendant Knowingly, Intelligently and Voluntarily Waived His *Miranda* Rights.**

Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990).  To protect the rights guaranteed by the Fifth Amendment the Supreme Court adopted the *Miranda* rules to be followed during custodial interrogations.  *See Miranda v. Arizona*, 384 U.S. at 444.  A suspect in custody must be warned that he has "a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id*.  Officers must explain these rights to a suspect before questioning begins.  *See Id*. at 469-70.  Statements elicited from a suspect in violation of *Miranda* are inadmissible. *See Stansbury v. California*, 511 U.S. 318, 322 (1994).  After the warnings have been given, if the suspect indicates in any manner at any time during questioning that he wishes to remain silent or that he wants an attorney, the interrogation must cease. *See Miranda*, 384 U.S. at 473-74.

After the reading of the *Miranda* warnings, a suspect's waiver of the Fifth Amendment privilege against self incrimination is only valid if it is made voluntarily, knowingly, and intelligently.  *See Miranda*, 384 U.S. at 444; *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir.2002).  A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S.

412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*.

The Supreme Court held in *Miranda* that "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475. The *Miranda* Court further stated that "[s]ince the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." *Id*. The Supreme Court noted in *Colorado v. Connelly* that "[w]henever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." 479 U.S. 157, 168 (1986). "The totality of the circumstances of each case must be examined to determine if an accused has made a voluntary, knowing and intelligent waiver of his rights to remain silent and to have counsel present." *Lamp v. Farrier*, 763 F.3d 994, 997 (8th Cir.), *cert. denied* 474 U.S. 1009 (1985) (internal quotations omitted).

The *Miranda* Court noted that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id*. In *North Carolina v. Butler*, 441 U.S. 369 (1979), the Supreme Court overruled the holding of the North Carolina Supreme Court that *Miranda* required a defendant to explicitly waive his right to an attorney at the time the statement was made in order for the statement to be admissible. The *Butler* Court held that an explicit statement of waiver is not necessary to

support a finding that a defendant waived his right to counsel.

In *Butler*, the Supreme Court stated:

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

441 U.S. at 373. Therefore, as stated by the Supreme Court in *Butler*, some circumstances may exist where a waiver of a defendant's *Miranda* rights may be inferred from "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Id*.

In the present case, Defendant argues that he did not validly waive his *Miranda* rights. Defendant argues that he was presented with a false choice when Officer Gomez said "would you like to talk to me about the, the case, or would you like to talk to an attorney?" (Exhibit 3 at 2.) Defendant argues that "[r]ather than waiving his right to have an attorney present for questioning, what [Defendant] did was to acknowledge a preference to speak with Officer Gomez." (Def.'s Mem. at 6.) Defendant argues that "[a] valid waiver would have included a preference to speak with Officer Gomez alone, and not with an attorney present." (Def.'s Mem. at 6.) Defendant further argues that Officer Gomez used "deficient Spanish language" when he informed Defendant of his *Miranda* rights in Spanish.[1] (Def.'s Mem. at 6.)

---

[1] Defendant argues that what Officer Gomez said to Defendant, when translated into English, would be: "Like you (sic) to talk with me about the case or like you (sic) to talk with a lawyer?" (Def.'s Mem. at 6.) However, the Government entered a transcription and translation of the interrogation from a federally certified interpreter, and the Court concludes that the translation conducted by the federally certified interpreter is the correct interpretation of Officer Gomez's statements to Defendant. Therefore, the Court rejects Defendant's argument that his

16

After reviewing the totality of the circumstances in this case, the Court concludes that the prosecution has met its heavy burden to prove, by a preponderance of the evidence, that Defendant validly waived his *Miranda* rights before speaking with Officer Gomez at the police station. Officer Gomez informed Defendant of each right and asked Defendant after stating each right whether Defendant understood that right. After he informed Defendant of all of his *Miranda* rights, he asked Defendant "[y]ou did understand all the rights, didn't you? (Gov't Ex. 3 at 2.) Defendant again responded in the affirmative. Immediately after describing each right to Defendant and ensuring, via verbal agreement, that Defendant understood all of his rights, Officer Gomez then asked Defendant "would you like to talk to me about the, the case, or would you like to talk to an attorney?" (Gov't Ex. 3 at 2.) This statement followed directly on the heels of Defendant's assertions that he understood his rights. As stated by the United States Supreme Court in *North Carolina v. Butler*, some circumstances may exist where a waiver of a defendant's *Miranda* rights may be inferred from "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." 441 U.S. at 373.

In this case, Defendant was not silent, but, rather, engaged in a course of conduct indicating waiver of his right to an attorney when he informed Officer Gomez that he would talk to Officer Gomez about the case. Defendant contends that "[r]ather than waiving his right to have an attorney present for questioning, what he did [when he told Officer Gomez that he would talk to Officer Gomez about the case] was to acknowledge a preference to speak with Officer Gomez." (Def.'s Mem. at 6.)

---

statement to Officer Gomez should be suppressed because Officer Gomez used "deficient Spanish language."

Defendant argues that he was given a false choice, and that "[a] valid waiver would have included a preference to speak with Officer Gomez alone, and not with an attorney present." (Def.'s Mem. at 6.) The question as worded, standing alone, is at best misleading. It suggests that Defendant's only choices were to talk to Officer Gomez or talk to a lawyer. As courts insist that assertions of the Fifth Amendment right to counsel be clear and unambiguous, *Davis v. United States*, 512 U.S. 452 (1994); *Simmons v. Bowersox*, 235 F.3d 1124 (8th Cir. 2001), courts should discourage law enforcement officers from asking misleading or ambiguous questions when attempting to ascertain whether a suspect who is in custody, is willing to waive his rights under the Fifth Amendment. Were this the only question Officer Gomez asked, the Government would not have met its burden to establish a knowing and voluntary waiver.

However, a review of the totality of the circumstances reveals that, notwithstanding Officer Gomez's misleading question, Defendant was fully aware of his Fifth Amendment rights and nevertheless chose to speak with Officer Gomez without an attorney present. Officer Gomez had expressly and clearly explained that Defendant had a right to remain silent, that anything Defendant said could be used against him in court, and that he had "the right to speak to an attorney and have him present before and while we interrogate you." After being asked if he understood each of these rights, Defendant repeatedly said, "Yes." Defendant did talk to Officer Gomez alone, without an attorney present.

Under these circumstances, the Court concludes that Defendant knowingly and voluntarily waived his *Miranda* rights. Although Officer Gomez's ultimate question regarding waiver should have been more clear, the Court is persuaded that Defendant here, like the Defendant in *Butler*, demonstrated a knowing and intelligent waiver by his course of conduct coupled with an

18

understanding of his rights. Defendant's waiver of his right to have an attorney present at questioning can be inferred from the fact that he stated that he understood each and everyone of his *Miranda* rights and stated that he still desired to speak about the case with Officer Gomez, rather than speaking with an attorney. The Court recommends that Defendant's Motion for suppression of statements [#19] be **DENIED**.

### III.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion for suppression of statements [#19] be **DENIED;** Defendant's Motion for suppression of evidence from search and seizure [#20] be **DENIED**; and the Government's Motion to Supplement the Record [#29] be **GRANTED**.


DATED: December 1, 2006                             s/ *Franklin L. Noel*
                                                    FRANKLIN L. NOEL
                                                    United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 20, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **December 20, 2006,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.